## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**ELIZABETH R. SMITH,**

      **Plaintiff,**

**vs.**                           **Case No. 4:10cv472-MP/WCS**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

      **Defendant.**

_____/

### REPORT AND RECOMMENDATION

      This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D. Loc. R. 72.2(D).   It is recommended that the decision of the Commissioner be reversed and remanded.

**Procedural status of the case**

      Plaintiff, Elizabeth R. Smith, applied for disability insurance benefits.  Her last date of insured status for disability benefits was December 31, 2006, and thus she must show onset of disability before then.  Plaintiff alleges disability due to fibromyalgia, affective disorder, low back pain after surgery, degenerative disc disease, knee pain,

and asthma, with onset on August 7, 2004.  Plaintiff was 50 years of age on August 7, 2004, has a 12th grade education, and has past relevant work as a clerk and complaint analyst.  The Administrative Law Judge found that Plaintiff had the residual functional capacity to do a limited range of sedentary work, can still do her past relevant work as performed, and thus was not disabled during the period under consideration.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002).  "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted).  The court must give "substantial deference to the Commissioner's decision."  Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."  Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed

all evidence and has sufficiently explained the weight he has given to obviously

probative exhibits, to say that his decision is supported by substantial evidence

approaches an abdication of the court's 'duty to scrutinize the record as a whole to

determine whether the conclusions reached are rational.' "  Cowart v. Schweiker, 662

F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the

claimant is not only unable to do past relevant work, "but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful work

which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).  A disability is an

"inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12

months . . . ."  42 U.S.C. § 423(d)(1)(A).  Both the "impairment" and the "inability" must

be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212, 122

S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)-(f):

1.     Is the individual currently engaged in substantial gainful activity?

2.     Does the individual have any severe impairments?

3.     Does the individual have any severe impairments that meet or
       equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.     Does the individual have any impairments which prevent past
       relevant work?

5.     Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of

the application for benefits.  A positive finding at step three results in approval of the

application for benefits.  At step four, the claimant bears the burden of establishing a

severe impairment that precludes the performance of past relevant work.  If the claimant

carries this burden, the burden shifts to the Commissioner at step five to establish that

despite the claimant's impairments, the claimant is able to perform other work in the

national economy.  Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050,

1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove

that he or she cannot perform the work suggested by the Commissioner.  Hale v.

Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Evidence from the administrative hearing**[1]

Plaintiff testified at the second administrative hearing, held on August 9, 2007,

that she was then 53 years of age.  R. 632.  She had completed high school.  *Id.*  She

last worked for the Florida Department of Motor Vehicles as a clerk.  R. 635.  She did

filing, research, and spoke to citizens about motor vehicle tags.  R. 636.  The job was

---

[1] Descriptions of the purpose and effects of prescribed drugs are from PHYSICIANS' DESK REFERENCE, as available to the court on Westlaw, or PDRhealth™, PHYSICIANS' DESKTOP REFERENCE, found at http://www.pdrhealth.com/drugs/drugs-index.aspx, or PUBMED HEALTH, found at http://www.ncbi.nlm.nih.gov/pubmedhealth/, or EVERYDAYHEALTH, found at http://www.everydayhealth.com/drugs. Information about medical terms and prescription drugs come from DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS, available at:  http://www.mercksource.com (Medical Dictionary link) OR MEDLINE PLUS (MERRIAM-WEBSTER), found at: www.nlm.nih.gov/medlineplus/mplusdictionary.htm or NATIONAL INSTITUTES OF HEALTH, found at: http://health.nih.gov.  Social Security Rulings can be found at: http://www.ssa.gov/OP_Home/rulings/rulfind1.html.  The pages at these websites are not attached to this report and recommendation as the information is relatively well-settled, the precise definitions are not at issue in this case, and the definitions are not likely to be in dispute.

sedentary with some walking and standing.  *Id*.  She was first a senior clerk and then a senior consumer complaint analyst.  R. 637.  The duties were very similar.  R. 643.  She handled telephone calls about tags and registrations.  R. 642.

Plaintiff testified that she can no longer work due to chronic back pain radiating down her left leg, with numbness, and knee impairments, and that over the years, her pain had become worse.  R. 645.  She was 5 feet 3 inches tall and weighed 222 pounds.  R. 633.  Plaintiff also said she could not work due to stress and depression.  R. 646.  She said she had not had any mental health treatment for lack of insurance or money to pay for it.  *Id*.  She had been given and took samples of Cymbalta[2] by Dr. Ortiz.  R. 646-647.  She had been seeing Dr. Ortiz, a neurologist, for the prior 15 years.  R. 647.

Plaintiff said she was also taking OxyContin[3] for pain.  R. 653.  She had been using it for five or six years.  *Id*.

Plaintiff testified that she can sit for a couple of hours before having to move, but could stand for only 5 to 10 minutes.  R. 655.  She said that she used a cane prescribed by Dr. Rolle.  R. 656.  She said that Dr. Rolle told her that surgery would not correct her

---

[2] Cymbalta is used to treat major depression, diabetic neuropathy (a painful nerve disorder associated with diabetes that affects the hands, legs, and feet), generalized anxiety disorder, and fibromyalgia (a condition characterized by weakness and pain in the muscles and tissues surrounding the joints).  PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

[3] OxyContin is a controlled-release form of the narcotic painkiller oxycodone used for the management of moderate to severe pain when continuous, around-the-clock relief is needed for an extended period of time.  PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

knee problems.  *Id*.  She said that due to back pain, she can lift only 2 to 3 pounds.  R. 656-657.

Plaintiff said that she does not get up until 10 or 11 a.m.  R. 662.  She is able to fix cereal for breakfast.  *Id*.  She said that her husband did the cooking, and that she seldom cooked.  R. 658.  She sometimes fixed a sandwich for lunch, but most of the time did not eat lunch.  R. 665.  She could not do the laundry, vacuum, sweep, mop, make a bed, sew, play cards, or garden, and only sometimes could sit and do the dishes.  R. 658-659.  She sometimes watched television, but did not use the computer in her home.  *Id*.  She attended church once a week.  R. 659.  She did not drive to the hearing.  *Id*.  She goes to the pharmacy to pick up medication.  R. 668.  She was able to take care of her personal needs.  R. 660.  She went to bed in the mid-afternoon and stayed in bed until 7 or 8 p.m..  R. 662-663.  She spends 4 to 6 hours daily lying down.  R. 664.  She said that most of the time in bed she is in pain, but her medication (OxyContin) decreases the pain some.  R. 663.  Sometimes she walks out onto her porch.  *Id*.

Plaintiff said that she was depressed "a lot."  R. 665.  She was depressed "most of all the time."  R. 666.  She said: "I cry, what I'm doing now."  *Id*.  She said that the medication she takes for depression does not help.  R. 667.  She said that her depression "affects me as being whole, I can't do the things that I want to do."  *Id*.

**Medical evidence**

On June 13, 1999, Plaintiff had an MRI of her lumbar spine.  R. 214.  At L4-L5 there was a mild diffuse annular bulge associated with mild spondylosis, with mild facet hypertrophy, all producing a moderate left L4 foraminal stenosis with effacement of the

majority of the epidural fat surrounding the exiting L4 nerve root sleeve.  *Id.*  Correlation

for left L4 radiculopathic symptoms was requested.  *Id.*

On August 31, 2011, another MRI of Plaintiff's lumbar spine revealed findings

similar to the June 13, 1999, MRI.  R. 213.  The impression was mild to moderate

foraminal narrowing at L4-L5 due to annular disc bulging, greater on the left than on the

right, probably unchanged since June, 1999.  *Id.*

On October 17, 2002, Plaintiff was seen by Shahid Zeb, M.D.  R. 263.  Dr. Zeb

reported that she had chronic pain, depression, and fibromyalgia.  *Id.*  She was then

taking OxyContin twice a day so that she could function, to help with "the unrelenting

pain."  *Id.*  He noted that she was taking Wellbutrin[4] and going to Dr. Thai, her

psychiatrist.  *Id.*  Plaintiff complained of pain all over her body.  *Id.*  On examination, Dr.

Zeb found 18 of the 18 fibromyalgia tender points.  *Id.*

On July 14, 2003, Plaintiff was seen by Winston R. Ortiz, M.D., who is board

certified in neurology.  R. 211, 208.  He said that Plaintiff was having more pain, mainly

when standing for more than 5 minutes.  R. 211.  Plaintiff said that the best medication

had been Topamax,[5] and that she had tried physical therapy multiple times without any

relief.  *Id.*  Plaintiff described her pain as a band around her waist, above her buttocks,

---

[4] Wellbutrin is used to treat major depressive disorder.  PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

[5] Topamax is an antiepileptic drug, prescribed to control both the mild attacks known as partial seizures and the severe tonic-clonic convulsions known as grand mal seizures.  It is typically added to the treatment regimen when other drugs fail to fully control a patient's attacks.  It is also prescribed for the prevention of migraine headaches.  PDRhealth™, PHYSICIANS' DESKTOP REFERENCE

but shooting down her left leg and up her back on the left.  *Id.*  Some tenderness and muscle spasm was seen on the left upon examination.  *Id.*

On December 15, 2003, Plaintiff returned to Dr. Ortiz.  R. 209.  Dr. Ortiz had tried Topamax, Trazodone,[6] atenotol,[7] OxyContin, and Soma.[8]  *Id.*  Her pain was slightly improved with the medication, but the pain persisted in her back and down her leg.  *Id.* He noted that she was "getting a little depressed" and that she had fibromyalgia.  *Id.*  He had her continue with Topamax, restarted Trazodone, and thought that she needed to be referred to a pain clinic.  *Id.*

On January 9, 2004, Dr. Ortiz stated that Plaintiff had been under his care for many years for multiple medical problems.  R. 208.  He said: "I deemed her totally permanently disabled in regard to her back pain in December of 2001.  She has not worked since that time."  *Id.*

On February 11, 2004, Plaintiff was seen by Beverly Walker, Physician's Assistant to Dr. Ortiz, and she discussed her findings with Dr. Ortiz.  R. 203-207.  Her then current medications included MS Contin,[9] Trazodone, Topamax, and albuterol.  R.

---

[6] Trazodone hydrochloride, sold as Desyrel, is an antidepressant.  PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

[7] Atenolol is used alone or in combination with other medications to treat high blood pressure.  It also is used to prevent angina (chest pain) and improve survival after a heart attack.  Atenolol is in a class of medications called beta blockers. It works by relaxing blood vessels and slowing heart rate to improve blood flow and decrease blood pressure.  PUBMED HEALTH.

[8] Soma is used, along with rest, physical therapy, and other measures, for the relief of acute, painful muscle strains and spasms.  PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

[9] MS Contin, a controlled-release tablet containing morphine, is used to relieve moderate to severe pain.  While regular morphine is usually given every 4 hours, MS

203.  Plaintiff reported that she had no energy, multiple joint pains and numbness, worse with prolonged standing, walking, or sitting.  *Id*.  PA Walker noted a history of, among other things, low back and left lower extremity pain, fibromyalgia, shoulder and knee pathology, hypertension, depression, and asthma.  *Id*.  Plaintiff had been prescribed Wellbutrin but she said she did not take it regularly because "she feels it does not help."  *Id*.  PA Walker noted lumbar spinal MRIs from 1987, 1990, 1996, 1999, and 2001, which were "unremarkable for surgical pathology."  *Id*.  The mild canal narrowing at L4-L5 was mentioned, but it was also noted that "multiple electromyograms have failed to demonstrate entrapment neuropathy or radiculopathy."  *Id*.  Several injuries were also noted, but it was unclear which injuries were responsible for her permanent disability.  R. 204.  On November 13, 2001, Dr. Ortiz "placed her at total permanent disability secondary to pain."  *Id*.  In the past, weight loss had improved her systems.  *Id*.  She was five feet three inches and weighed 201 pounds that day.  *Id*.  On examination, PA Walker found that Plaintiff's strength was undiminished throughout, and there were no cervical muscle spasms.  R. 205.  Gait was normal.  *Id*.  Plaintiff had no lumbosacral muscle spasms or guarding.  *Id*.  The left lower thoracic paraspinal muscles had "increased muscle tone," but no pain to palpation.  *Id*.  Her diagnosis was chronic pain syndrome, with cervical and lumbar degenerative disc disease, by history, a history of depression, obesity, and a history of hypertension.  R. 205-206.  Plaintiff

---

Contin is typically taken every 12 hours – only twice a day.  The Kadian brand may be taken once or twice a day.  The drugs are intended for people who need a morphine painkiller for more than just a few days.  PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

had been referred to CHP (Capital Health Plan) Pain Clinic on February 27, 2004.  R. 206.

On April 7, 2004, Plaintiff told PA Walker that she felt less depressed since starting to use Effexor.[10]  R. 200.  Plaintiff had been to the pain clinic and Dr. Khanna[11] had provided an injection.  *Id.*  The increase in MS Contin had been only minimally helpful for pain.  *Id.*  Plaintiff was in the midst of mediation for a worker's compensation claim.  *Id.*  She reported ongoing lower back and left lower extremity pain, and fatigue. *Id.*  She had lost some weight.  *Id.*  The same diagnosis was entered.  R. 200-201.  PA Walker noted that taking atenolol might be contributing to her fatigue, bradycardia, and possibly her depression.  R. 201.  She planned to order another lumbar MRI if the low back and leg pain continued following the injection.  *Id.*

On June 29, 2004, Plaintiff told Dr. Ortiz that the epidural injections had not relieved her pain.  R. 199.  Plaintiff said again that OxyContin had worked better than MS Contin for pain, but Dr. Ortiz preferred to continue with MS-Contin, increasing the dosage.  *Id.*  Dr. Ortiz referred her again to Dr. Khanna to see if he had anything else to offer, and continued to prescribe Soma and exercise.  *Id.*  He switched her from Effexor to Lexapro.[12]  *Id.*  He ordered that Plaintiff not drive a motor vehicle for at least two weeks until she felt comfortable with the higher dose of MS Contin.  *Id.*

---

[10] Effexor is prescribed for the treatment of depression – that is, a continuing depression that interferes with daily functioning.  Effexor is also prescribed to relieve abnormal anxiety (generalized anxiety disorder and social anxiety disorder), which may include sleep disturbance.  PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

[11] Dr. Khanna's medical records are not in this record.

[12] Lexapro is prescribed for major depression a persistently low mood that interferes with daily functioning.  PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

On July 13, 2004, Plaintiff was referred to neurosurgeon Christopher Rumana, M.D., on referral from Dr. Khanna due to back pain radiating through her left leg.  R. 223.  Plaintiff rated the pain level at 10.  *Id.*  Dr. Rumana noted that Plaintiff had been treated by Drs. Ortiz and Khanna and "treated with a tremendous amount of medications," and that the epidurals had not helped.  *Id.*  She had been referred to Dr. Rumana for a neurosurgical evaluation.  *Id.*  Dr. Rumana noted that Plaintiff appeared to be uncomfortable.  *Id.*  Straight leg raising testing was positive for pain on the left.  R. 224.  He noted that Plaintiff had weakness of her left extensor hallucis longus muscle, "which is about 4/5 in strength."  *Id.*  She had decreased sensation along the medical aspect of her left foot and to a lesser extent the lateral aspect of her left foot.  *Id.*  Her gait was normal.  *Id.*  Dr. Rumana reviewed an MRI scan that had been conducted on June 21, 2004, finding:

> this shows lumbar spondylosis at L4-5 and L5-S1.  There is foraminal narrowing at L4-5 and L5-S1 on the left, which seems a bit worse at the L5 level with some probable L5 nerve root compression along the neural foramen.

R. 224.  His diagnosis was left L5 radiculopathy, L5-S1 foraminal narrowing, and probably left L5 nerve root compression with left L5 radiculopathy.  *Id.*  He explained the options, which included what Plaintiff had already done and surgical decompression.  R. 225.  Dr. Rumana concluded:

> The patient understands she is on tremendous pain medication that she may have some constant chronic pain after this, but I think surgery will give her the best chance of improving her situation.  If it does not, however, she will need to work with Dr. Khanna again for possible placement of a dorsal column stimulator or morphine pump to further improve her situation.

R. 225.

Plaintiff underwent spinal surgery on July 21, 2004.  R. 220.  On August 7, 2004,

Dr. Rumana reported that she was "some better but she is still having quite a bit of pain"

and still required high doses of narcotics.  R. 222.  Dr. Rumana determined that Plaintiff

had "mild pain improvement but still [had] quite a bit of problems."  *Id*.  He referred her

to physical therapy and to Dr. Ortiz for narcotics.  *Id*.  He thought that a dorsal stimulator

or a morphine pump was the best approach to help with her chronic pain syndrome.  *Id*.

He did not think she would have pain improvement with epidural steroid injections.  *Id*.

He left the further management of Plaintiff's pain up to Dr. Khanna.  *Id*.

On November 1, 2004, Plaintiff was examined by Iqbal A. Faruqui, M.D., on a

consultative basis at the request of the Commissioner.  R. 423-426.  Plaintiff said that in

1984, while working in food service at Florida State Hospital, she slipped and fell,

injuring her back.  R. 423.  She got a job as a clerk with the Florida Department of Motor

Vehicles, and worked there for nine years, "but her pain continued to get worse" and

she stopped working in 2002 because "it was hard for her to sit all day long and she

was on strong medications causing drowsiness."  R. 425.  Plaintiff said that she had

pain all the time, but her pain was worse with prolonged sitting, standing, walking, or

any strenuous activity, and worse on the left side such that she sometimes sits tilted to

the right side.  R. 423.  Nothing had helped except that she got some relief with pain

medication, but once the medication wore off, she was again in pain.  *Id*.  Plaintiff said

that about five years earlier, Dr. Szczesny, a rheumatologist, had found that she had

fibromyalgia.  R. 424.  Dr. Faruqui noted that use of a cane helped take pressure off and

for balance, and she could not climb steps without the cane.  R. 423-424.  Plaintiff said

that her asthma was well-controlled with inhalers.  R. 424.  While Plaintiff had been

diagnosed with depression and had been treated by a psychiatrist in the prior five years, she relied upon her primary physician for medication for depression.  *Id.*   Dr. Faruqui noted her back surgery and that she had had left knee arthroscopic surgery three times in the past.  *Id.*  On examination, Dr. Faruqui observed that Plaintiff walked with a cane, looked depressed, and looked "somewhat uncomfortable while walking and sitting", did not sit for long, and walked a few steps around the room.  *Id.*  Dr. Faruqui found that Plaintiff's lower spinal column was tender, with some spasm in the left paraspinal muscles.  R. 426.  Her fingers were slightly swollen and arthritic changes were present.  *Id.*  There was significant crepitus in her knees bilaterally.  *Id.*  Although Plaintiff had full range of motion in all body joints, movement caused pain, especially in lumbar flexion and extension.  *Id.*  Plaintiff's gait was antalgic.  *Id.*  She put more pressure on her right leg "and walks with [a] cane but she can walk without [a] cane."  *Id.*  Straight leg raising was positive for pain at 80 degrees on the right and 60 degrees on the left.  *Id.*  Dr. Faruqui found that Plaintiff had some difficulty getting up and down from examination table or getting up from a chair, and while getting up from a chair, put pressure on the cane.  *Id.*  Plaintiff could not completely squat due to pain.  *Id.*

In summary, Dr. Faruqui recited all of the treatment that Plaintiff had received, and said that nothing seems to have helped on a permanent basis.  R. 426.  He said that while she was ambulatory, she used a cane and he thought that the cane was medically necessary due to her potential for a fall and to help release pressure from her affected side, resulting in pain control.  *Id.*  Dr. Faruqui said that Plaintiff's depression needed to be evaluated, and he also felt that she might need a physical capacity

assessment.  *Id.*  He concluded: "I doubt very much that she will be able to return to work."

On November 4, 2004, Plaintiff had a mental status consultative evaluation by Lawrence V. Annis, Ph.D.  R. 427-428.  Plaintiff told Dr. Annis that her chronic pain was the problem that kept her from working.  R. 427.  She said she could not sit or stand long, and that she had been like that for 10 or 15 years.  *Id.*  Plaintiff said that she had had a few doses of antidepressant medications "some time ago," but that did not help.  *Id.*  Plaintiff drove herself to a doctor's appointment the previous day, but limited her driving because she cannot sit for long due to pain.  R. 428.  She said that she had restricted range of motion, difficulty bending, fatigue, and weakness.  *Id.*  She said she helps with cooking, but her daughter does most of the work around the home.  *Id.*  She frequently lies down.  *Id.*  Dr. Annis said that Plaintiff's seated posture was stiff, and she sometimes adjusted her posture "as if uncomfortable."  *Id.*  He also observed: "Rising and descending to her seat appear awkward and uncomfortable."  *Id.*  Plaintiff's mood during the interview as depressed and moderately anxious.  *Id.*  Plaintiff told Dr. Annis that she was sad and depressed, feeling like no one cared, and in "so much pain."  *Id.* She said she cried every day and sometimes does not know why.  *Id.*  Plaintiff appeared to be preoccupied with physical problems and discomfort.  R. 428-429.  Plaintiff said that she had experienced problems with memory.  R. 429.  Dr. Annis's diagnosis was major depressive disorder, recurrent, chronic pain disorder associated with a general medical condition, and "unspecific below average intelligence (suspected but not tested)."  *Id.*  Dr. Annis thought that at least some degree of depression was likely to continue for the foreseeable future, though treatment might help.  *Id.*  Dr. Annis said that

in her activities of daily living, Plaintiff sought "assistance meeting demands that require

physical agility, strength and stamina." *Id.* He thought that Plaintiff was "socially

handicapped by depression and anxiety." *Id.* He said that her "current mental condition

would be expected to reduce her ability to participate in social interactions requiring

patience in difficult situations, careful attention, or protracted concentration." *Id.* Dr.

Annis concluded:

> Evidence was found of depression and anxiety to the degree that
> occupational achievement is impeded. If Ms. Smith's physical condition
> permits work, she would require more encouragement than do most
> people when encountering work difficulties or social challenges. She
> would probably not do well in occupations requiring frequent, protracted or
> demanding social interaction, such as receptionist, restaurant server,
> cashier, or sales clerk. Due to her distraction to physical and emotional
> factors, she should presently avoid employment at occupations requiring
> technical precision. If she is physically able, she is likely to do better in
> vocations that deal mostly with things, such as dishwasher, data entry
> operator, agricultural laborer, or cleaner.

R. 429-430. Dr. Annis also said that given her "history and interview presentation, your

office may wish to consider evaluating intellectual functioning." R. 430.

On December 15, 2004, a state agency psychologist, who did not examine

Plaintiff, determined that Plaintiff's mental impairments were not severe. R. 469, 481.

He reasoned that she "still resides independently & effectively handles a normal array of

routine personal/household responsibilities." R. 81.

On January 10, 2005, a non-examining physician said that he thought that

Plaintiff could perform light work, and said that Dr. Faruqi had determined that use of a

cane was not medically necessary. R. 484.

On May 23, 2005, Dr. Annis re-examined Plaintiff. R. 491-494. Plaintiff was

brought to the examination by her daughter. R. 491. Dr. Annis repeated much of the

same treatment history as before.  R. 491-492.  Again, he noted that she moved and

walked slowly, her gait was unsteady, and her seated posture was uncomfortable.  R.

492.  She appeared to be fatigued by slight physical demands, such as walking from the

waiting room to the interview room.  *Id*.  She was cooperative and polite.  *Id*.  Her mood

was depressed and anxious.  R. 493.  She again said that she cries daily.  *Id*.  She had

made up her mind to get a divorce from her husband, who seemed not to care about

her.  *Id*.  Plaintiff's focus was upon her immediate family, physical discomfort, and her

relationship with her husband.  *Id*.  Her attention during the interview was good.  *Id*.  Dr.

Annis's diagnosis was recurrent major depressive disorder, chronic pain disorder

associated with a general medical condition, and unspecified below average intelligence

(suspected but not tested).  *Id*.  He thought that her depression and anxiety were

"directly caused by physical limitations and physical pain, and by dependence on others

to do things for her, reduced her [sic] ability to do things with family, financial concerns,

diminished social opportunities, missing relationships and self-esteem associated with

employment, and concern about her relationship with her husband."  R. 493-494.  Dr.

Annis thought that her depression and anxiety would continue so long as she

experienced major physical problems.  R. 494.  He thought that her activities of daily

living were limited by her need for assistance from others.  *Id*.  He thought that

depression limited her ability to interact with people she does not know.  *Id*.  He

concluded that her depression and anxiety would impede her occupational

achievement, and she would need more encouragement than others, even if physically

able to work.  *Id*.  He said that she would not do well in work requiring frequent social

interaction, and should also avoid work requiring technical precision, driving, operating

machinery, or contact with dangerous substances. *Id.* He again suggested that Plaintiff's intellectual functioning be tested. *Id.*

On June 5, 2005, a second non-examining psychologist determined that Plaintiff's mental impairments were not severe. R. 495, 507.

On June 29, 2005, Plaintiff returned to Dr. Ortiz for treatment at the Tallahassee Neurological Clinic. R. 517. He noted that she had fibromyalgia and was treated by Dr. Zeb. *Id.* Plaintiff said she was unable to buy prescribed medication for lack of money and insurance. *Id.* Dr. Ortiz gave her samples of OxyContin for her leg pain, and suggested that she try Lidocaine patches. *Id.* On examination, he found her condition to be unchanged from previous visits. *Id.*

There is a break in the medical records, with the next record of treatment on what appears to be March 1, 2006, at the Bond Clinic in Tallahassee. R. 531. She had lost her health insurance when she and her spouse separated. *Id.* She complained of bilateral knee pain, lower back pain, migraines, asthma, and other health problems. *Id.* She was still taking OxyContin. *Id.* It was noted that she continued "to follow [a] neurologist for pain management and back disorder." *Id.* The assessment included chronic back and knee pain. R. 532. The medical note is signed by Cynthia Knight, ARNP. *Id.*

On what appears to be March 24, 2006, Plaintiff returned to the Bond Clinic and was seen by ARNP Knight. R. 530. It was noted that she had suffered situational depression for the prior two weeks. *Id.* Chronic back and knee pain was again noted. *Id.*

On May 20, 2006, Plaintiff was seen at the Bond Clinic.  R. 529.  She was seen by Marianne Towler, ARNP.  *Id.*  The pain in her knees had become more intense.  *Id.*  She had had three surgeries on her left knee and now her right knee was in pain.  *Id.*  A diagnosis of fibromyalgia by Dr. Zeb was noted, and it was also noted that his records were available to Nurse Towler.  *Id.*  On examination, Plaintiff's knees were not swollen and did not have crepitus.  *Id.*  She had good musculature in both legs.  *Id.*  Plaintiff had lost 14 pounds in the prior two and one-half months.  *Id.*

On May 24, 2006, Plaintiff was seen by Dr. Ortiz.  R. 520.  He again noted that she was treated for fibromyalgia by a rheumatologist.  *Id.*  He noted that she had been seen by his nurse practitioner in January, 2006.  *Id.*  She had a "slight limp" on May 24th, but otherwise Dr. Ortiz's findings from the examination were not changed from previous visits.  *Id.*  He said that Plaintiff had difficulty putting pressure on her knee and was having more pain on the left, and he thought that this was the cause of increased back pain.  *Id.*  He found that she had give away weakness in her leg due to pain.  *Id.*  Dr. Ortiz said that Plaintiff needed to go to the Bond Clinic to see if they could refer her to an orthopedist, or perhaps she might obtain this care with We Care.  R. 521.  He offered to prescribe Lyrica[13] or Cymbalta for pain, but Plaintiff could not afford to pay for those medication, so he continued the same regimen, OxyContin.  *Id.*  He said that Plaintiff was not having any side effects from her medication.  *Id.*

---

[13] Lyrica is a medicine used to treat seizures, pain from damaged nerves (neuropathic pain) that occur from diabetes and shingles (painful rash caused by chickenpox virus), and fibromyalgia (widespread muscle pain).  PDRhealth™, PHYSICIANS' DESKTOP REFERENCE..

On July 7, 2006, Plaintiff returned to the Bond Clinic.  R. 528.  It was noted that she had fibromyalgia, chronic joint pain, and depression.  *Id.*  Nurse Towler said that a week earlier, she had started Plaintiff on Wellbutrin.  *Id.*  Plaintiff said she had not noticed any improvement of her depression with Wellbutrin.  *Id.*  She still had pain in her knees and other joints, "which is becoming increasingly severe."  *Id.*  Nurse Towler found that Plaintiff now had crepitus in her joints, so she determined that Plaintiff had "arthritic pain along with fibromyalgia and depression."  *Id.*  The plan was to keep Plaintiff on Wellbutrin for a month to see if it helped her depression.  *Id.*  Naprosyn[14] was also prescribed, with the caution that Plaintiff use OxyContin "only when absolutely necessary."  *Id.*

On July 28, 2006, Plaintiff returned to the Bond Clinic.  R. 527.  She had been feeling somewhat better with Wellbutrin.  *Id.*  The day before, she began having "the shakes and feeling somewhat paranoid," but felt better after resting.  *Id.*  She still had pain below the ankles with some cramping.  *Id.*  Wellbutrin and Paxil[15] were prescribed, and she was to continue with Naprosyn.  *Id.*

On August 14, 2006, Plaintiff was seen in the Bond Clinic.  R. 526.  She continued to have "a lot of problems with her back and her legs."  *Id.*  She had been to the emergency room one time since she was last seen in the Bond Clinic.  *Id.*  She related that the emergency room staff confirmed that she had severe osteoarthritis.  *Id.*

---

[14] Naprosyn is a nonsteroidal anti-inflammatory drug.  PHYSICIANS' DESK REFERENCE (2004), p. 2902.

[15] Paxil relieves a variety of emotional problems.  It can be prescribed for serious, continuing depression that interferes with one's ability to function.  PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

Plaintiff said she was having a lot of headaches and pain in her ears.  *Id.*  Plaintiff was walking with a cane.  *Id.*  On examination, Nurse Towler found "a great deal of crepitus in both knees with passive range of motion."  *Id.*  Nurse Towler noted that Plaintiff was again applying for disability and said that she would "support her on that."  *Id.*  Plaintiff had been unable to obtain Wellbutrin at the pharmacy, and could not afford to purchase Paxil.  *Id.*

On September 12, 2006, Plaintiff returned to the Bond Clinic.  R. 525.  Plaintiff was still having difficulty walking, and thought that a walker might help but had not yet tried a walker.  *Id.*  Nurse Towler said Plaintiff was "doing pretty well with her Wellbutrin and Paxil."  *Id.*  She said that she had written a letter in support of Plaintiff's application for disability benefits.  *Id.*  The letter of reference is not in this record.

On September 26, 2006, Plaintiff saw Dr. Ortiz.  R. 519.  Plaintiff said her pain was a little worse, and she was having difficultly sitting on the left side of her buttocks.  *Id.*  She had been having a lot of problems with her knees, and needed treatment by an orthopedic surgeon.  *Id.*  On examination, Dr. Ortiz found that Plaintiff had pain in her lower back and left knee.  *Id.*  He did not see any swelling in the knee, but it was tender to touch.  *Id.*  She also had tenderness in her neck.  *Id.*  Dr. Ortiz's diagnosis was knee and ankle pain, mostly arthritic in nature, musculoskeletal neck pain, fibromyalgia, and worsening back pain.  *Id.*  He prescribed continued exercise, samples of Gabitril,[16] and OxyContin.  *Id.*  He referred her to We Care for help in seeing a pain doctor, and to the

---

[16] Gabatril is indicated as add-on therapy in adults and children 12 years and older for the treatment of partial seizures.  PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

Bond Clinic or We Care in hopes that they would arrange for her to see an orthopedist for her knees.  *Id.*  He scheduled her return in four months.  *Id.*

On October 10, 2006, Plaintiff returned to the Bond Clinic.  R. 524.  Nurse Towler said that Plaintiff was seeking disability status due to knee pain and inability to endure weight bearing.  *Id.*  She also reported that her depression had not improved.  *Id.* Plaintiff was still using a cane to walk.  *Id.*  She had no edema in her feet.  *Id.*  The assessment was knee pain, depression, asthma, and high blood pressure under good control.  *Id.*  Flexeril[17] was added to her medications.  *Id.*  Apparently the Bond Clinic could not refer her to psychiatry or to orthopedics until she had health insurance coverage (until "she gets on any kind of medical care plans"), but her need for that referral was noted.  *Id.*

On December 5, 2006, Plaintiff was seen at the Bond Clinic.  R. 523.  She had a bad cough that day.  *Id.*  The assessment was probable allergic cough and upper respiratory infection.  *Id.*  Her prescription of albuterol was increased.  *Id.*

On January 9, 2007, Plaintiff returned to see Dr. Ortiz.  R. 551.  He noted what had occurred when he last saw her, on September 26, 2006.  *Id.*  He noted that the samples of Gabitril had helped her, but she was unable to afford to buy more.  *Id.*  She continued to take OxyContin.  *Id.*  She was unable to qualify for We Care.  *Id.*  She planned to change from the Bond Clinic (in Tallahassee) to the Health Department in Quincy.  *Id.*  Dr. Ortiz said that her "biggest problem is she needs surgery on both knees

---

[17] Flexeril is a muscle relaxant prescribed to relieve muscle spasms resulting from injuries such as sprains, strains, or pulls.  Combined with rest and physical therapy, Flexeril provides relief of muscular stiffness and pain.  PDRhealth™, Physicians' Desktop Reference.

and is unable to afford it.  She doesn't have insurance."  *Id*.  He said that Plaintiff was having a lot of back and knee pain.  *Id*.  On examination, he said she had pain in the knees and lower back, with give away weakness in her legs due to pain.  *Id*.  He asked that she return in four months.  *Id*.

On April 2, 2007, Plaintiff again saw Dr. Ortiz.  R. 550.  She still could not afford to buy Gabitril.  *Id*.  Elavil[18] was tried but did not help.  *Id*.  The only medication that had helped was OxyContin, and he gave her a voucher to purchase OxyContin.  *Id*.  She had pain in her lower back and more "discomfort" on the left side of her back.  *Id*.  The pain went down into her leg.  *Id*.  Dr. Ortiz also prescribed Cymbalta and continued exercise.  *Id*.  She was to return in four months.  *Id*.

On July 16, 2007, Plaintiff returned to Dr. Ortiz.  R. 549.  Plaintiff complained of numbness of her hand that awoke her at night.  *Id*.  She was "having more tingling sensation in her back and pain going down the left buttocks with a limp if she stands too long or walks too long."  *Id*.  Her back pain was "basically about the same."  *Id*.  Tinel's sign[19] was positive in both hands and he thought that numbness of her hand was caused by carpal tunnel syndrome.  *Id*.  Neurontin[20] was prescribed ("if she is able to

---

[18] Elavil is an antidepressant with sedative effects; the active ingredient is amitriptyline HCL.  PHYSICIANS' DESK REFERENCE (2005).  Amitriptyline hydrochloride is a tricyclic antidepressant having sedative effects; it is also used for treatment of chronic pain.  DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

[19] Tinel's sign is:  "A tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve.  It indicates a partial lesion or the beginning regeneration of the nerve."  DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

[20] Neurontin has two uses.  First, it may be prescribed with other medications to treat partial seizures (the type in which symptoms are limited).  It can be used whether or not the seizures eventually become general and result in loss of consciousness.  Second, it

afford it"), and OxyContin was continued.  *Id.*  She was to return in two or three weeks

for nerve conduction studies.  *Id.*

The administrative hearing was on August 9, 2007.  R. 626.  The administrative

decision was on January 25, 2008.  R. 24.

On March 27, 2008, Dr. Ortiz completed a questionnaire that was presented to

the Appeals Council.  R. 547.  He said he thought that Plaintiff was suffering from a

disability that prevents her from returning to work and engaging in substantial gainful

activity.  *Id.*  He thought that the earliest date of onset was in 2001.  *Id.*  He said that she

could walk only 50 feet before having to stop due to severe back pain and muscular

pain.  *Id.*  He said that this impairment was related to a work injury in the 1980s.  *Id.*  Dr.

Ortiz thought that Plaintiff could sit for no longer than one hour for the same reasons.

*Id.*  He said she had some limitation in fingering, reaching, or handling, but not a

significant limitation.  R. 548.  He said she might occasionally lift five pounds and

frequently lift and carry less than five pounds due to severe back and muscle pain.  *Id.*

He thought that Plaintiff could perform simple repetitive tasks, but that her concentration

was compromised by her impairments.  *Id.*  Dr. Ortiz said that Plaintiff suffered from

severe back pain, fibromyalgia, obesity, and depression.  *Id.*  He thought that she met

the medical or vocational listings for disability.  *Id.*

On December 1, 2008, Plaintiff returned again to Dr. Ortiz for treatment.  R. 558.

She continued to have back pain.  *Id.*  Dr. Ortiz noted that she had been given

---

can be used to relieve the burning nerve pain that sometimes persists for months or
even years after an attack of shingles (herpes zoster).  PDRhealth™, PHYSICIANS'
DESKTOP REFERENCE.

OxyContin for a long time and it was helping her.  *Id.*  He said she did not have "any aberrant behaviors nor any major side effect of the medication."  She had been "having a lot of pain for the past few days needing to be on bedrest."  *Id.*  She had been given a trial of Lyrica.  *Id.*  He gave her Lidoderm patches and a prescription for OxyContin and Cymbalta.  *Id.*  On examination, Dr. Ortiz found that Plaintiff had "limited range of motion of the right hip and tenderness in the greater trochanteric bursa with limited range of motion in the lower back."  R. 559.  She had a little bit of a swollen ankle and tenderness of the left and right ankle, and some left wrist tenderness.  *Id.*  She had pain in her lower back with limited range of motion.  *Id.*  She was to return in four months.  *Id.*  She still had not been sent to an orthopedist.  *Id.*

On February 24, 2009, Plaintiff had a flare up of hip and lumbar back pain that was so significant that it altered her gait.  R. 560.  She reported that the OxyContin was no longer as effective as it had been in the past.  *Id.*  It was noted that she had difficulty walking, sitting, or standing, and had difficulty finding relief in any position.  *Id.*  An MRI of the lumbar spine to rule out stenosis or foraminal narrowing and an MRI of the right hip to rule out avascular necrosis was recommended.  *Id.*  She was sent to We Care for assistance with the MRIs.  *Id.* and R. 563.  Plaintiff was using the Lidoderm patches under her splint to relieve the symptoms of right carpal tunnel syndrome.  R. 560.  She had been having chronic headaches, with changes of vision, nausea, dizziness, and other symptoms consistent with vascular headaches.  *Id.*  Unfortunately, she had caused herself to experience rebound headaches because she had used Excedrin on a regular basis.  *Id.*  The assessment was back pain and right carpal tunnel syndrome.  R. 562.

On April 30, 2009, Plaintiff returned to Dr. Ortiz.  R. 564.  He said that, unfortunately, all he had been able to do is chronic pain management since she did not have insurance to see the pain physician.  *Id.*  His office was still trying to schedule the two MRIs through We Care.  *Id.*  He said that if Plaintiff did not take her medication, "she will be bedridden most of the time."  *Id.*  He said that her ankle problems were not due to fibromyalgia, and might be related to the ankle joint.  *Id.*

On August 28, 2009, Plaintiff had an MRI of her lumbar spine.  R. 571.  This revealed post surgical changes at L5-S1 with hypertrophic facet degeneration and left greater than right foraminal stenosis.  *Id.*  It also revealed facet degeneration at L5-S1 with a focal area of bony or synovial overgrowth narrowing the left L4 neural foramen potentially coming into contact with the L4 nerve root sleeve, and mild canal narrowing at L3-4, but with no lumbar compression deformity or subluxation.  *Id.*

On October 9, 2009, Dr. Ortiz stated his opinion that Plaintiff's condition met Listing 1.04.  R. 580.  He said that she had suffered severe debilitating back pain for many years.  *Id.*  He said she also had high blood pressure, asthma, and fibromyalgia, and her prognosis was poor.  *Id.*  On November 9, 2009, he clarified that his opinion that she had this impairment for many years was based upon her condition from 2002 through 2008.  R. 579.

**Legal analysis**

> **Whether the Administrative Law Judge erred in his rejection of the opinions of the treating physician and the opinions of examining physicians, and whether he erred in failing to recontact the treating Nurse Practitioner**

>> **Dr. Ortiz**

Dr. Ortiz treated Plaintiff for many years.  The opinion of a claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary.  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997); Winschel v. Commissioner of Social Sec., 631 F.3d 1176, 1179 (11th Cir. 2011). This is so because treating physicians:

> are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(d)(2).  Important to the determination of whether there is a "detailed, longitudinal picture" of impairments is the length of the treatment relationship, the frequency of examination, the extent of the knowledge of the treating source as shown by the extent of examinations and testing, the evidence and explanation presented by the treating source to support his or her opinion, the consistency of the opinion with the record as a whole, and whether the treating source is a specialist with respect to the particular medical issues.  20 C.F.R. § 404.1527(d)(2)-(5).

The reasons for giving little weight to the opinion of a treating physician must be supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992), and must be clearly articulated.  Phillips v. Barnhart, 357 F.3d 1232, 1241 (11th

Cir. 2004).  "The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error." MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986).

This circuit finds good cause to afford less weight to the opinion of a treating physician "when the: (1) treating physician's opinion is not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  Winschel, 631 F.3d at 1179; Phillips v. Barnhart, 357 F.3d 1232, 1240-1241(11th Cir. 2004); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991) ("The treating physician's report may be discounted when it is not accompanied by objective medical evidence or is wholly conclusory."). See also, Crawford v. Commissioner Of Social Security, 363 F.3d 1155, 1159 (11th Cir. 2004) (finding good reasons articulated by the ALJ to discount the treating physician's opinion).

"The opinions of nonexamining, reviewing physicians . . ., when contrary to those of the examining physicians, are entitled to little weight, and standing alone do not constitute substantial evidence."  Sharfarz v. Bowen, 825 F.2d 278, 280 (11th Cir. 1987).  See also, Swindle v. Sullivan, 914 F.2d 222, 226 n.3 (11th Cir.1990) (the opinion of a non-examining physician is "entitled to little weight and taken alone does not constitute substantial evidence to support an administrative decision" ), citing, Broughton v. Heckler, 776 F.2d 960, 962 (11th Cir.1985).  Nonetheless, although the ALJ is not bound by nonexamining state agency sources, assessments by non-examining physicians may be considered by the ALJ as expert opinions.  20 C.F.R. § 416.927(f)(2)(i).

Dr. Ortiz, a neurologist, treated Plaintiff for many years.  On January 9, 2004, he expressed his opinion that she was totally and permanently disabled.  R. 208.  Dr. Ortiz's medical notes indicate that he had the same opinion on November 13, 2001.  R. 204.

The Administrative Law Judge did not discuss Dr. Ortiz's opinion at all.  R. 21-23.  Indeed, he erroneously found that "[n]o treating physician has imposed significant restrictions."  R. 22.  Dr. Ortiz determined that Plaintiff is totally disabled.  While that opinion did not elaborate upon specific work restrictions, it was not reasonable to conclude that the opinion was not an "imposition" of work restrictions.  Permanent total disability means enough significant restrictions apply to preclude all kinds of work for an 8 hour day, 40 hours a week.

It is true that the ALJ was not required to give "substantial weight" to the opinion of a treating physician as to the ultimate issue, disability, but that does not mean that the ALJ could completely ignore that opinion.

> A medical source opinion that an individual is "disabled" or "unable to work," has an impairment(s) that meets or is equivalent in severity to the requirements of a listing, has a particular RFC, or that concerns the application of vocational factors, is an opinion on an issue reserved to the Commissioner.  *Every such opinion must still be considered in adjudicating a disability claim*; however, the adjudicator will not give any special significance to the opinion because of its source.  See SSR 96-5p, "Titles II and XVI: Medical Source Opinions on Issues Reserved to the Commissioner."

SSR 96-8p, footnote 8 (emphasis added).  Experts in civil litigation routinely and properly express opinions touching upon ultimate issues.  *Cf.*, Federal Rule of Evidence 704(a) ("Except as provided in subdivision (b), testimony in the form of an opinion or

inference otherwise admissible is not objectionable because it embraces an ultimate

issue to be decided by the trier of fact.").

Dr. Ortiz's opinion is especially important in this case because Dr. Ortiz had had

an exceptionally long treatment history with Plaintiff.  The ALJ had the duty to discuss

and evaluate the opinion of Dr. Ortiz in light of all of the evidence, not discard it because

it treaded upon an ultimate issue reserved to the Commissioner.

Moreover, Dr. Ortiz's opinion as to disability should have prompted further inquiry

by the ALJ.  Where there is an ambiguity in the treating physician's records or opinion,

the Administrative Law Judge should take steps to clarify it:

> Additionally, if the ALJ determines that the treating physician's records are
> inconclusive or otherwise inadequate to receive controlling weight, absent
> other medical opinion evidence based on personal examination or
> treatment of the claimant, the ALJ must seek clarification or additional
> evidence from the treating physician in accordance with 20 C.F.R. §
> 404.1512(e).

Newton v. Apfel, 209 F.3d 448, 453 (5th Cir. 2000).  The Commissioner's regulations

provide that if "the evidence we receive from your treating physician . . . is inadequate

for us to determine whether you are disabled,"

> [w]e will first recontact your treating physician . . . to determine whether
> the additional information we need is readily available.  *We will seek
> additional evidence or clarification from your medical source when the
> report from our medical source contains a conflict or ambiguity that must
> be resolved , the report does not contain all the necessary information, or
> does not appear to be based on medically acceptable clinical and
> laboratory diagnostic techniques.*  We may do this by requesting copies of
> your medical source's records, a new report, or a more detailed report
> from your medical source, including your treating source, or by
> telephoning your medical source.  In every instance where medical
> evidence is obtained over the telephone, the telephone report will be sent
> to the source for review, signature and return.

20 C.F.R. § 404.1512(e)(1) (emphasis added).  *See also*, Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999) ("One of our recent opinions confirms, moreover, that an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record) (citing Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998) ("[E]ven if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating physician] sua sponte.")).

"Social Security proceedings are inquisitorial rather than adversarial.  It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits . . . ."  Sims v. Apfel,  530 U.S. 103, 110-111, 120 S.Ct. 2080, 2085, 147 L.Ed.2d 80 (2000), citing Richardson v. Perales, 402 U.S. 389, 400-401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971).  "Because a hearing before an ALJ is not an adversary proceeding, the ALJ has a *basic* obligation to develop a full and fair record."  Graham v. Apfel, 129 F.3d 1420, 1422 (11th Cir. 1997) (emphasis added), *citing*, Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981).  This basic duty exists whether or not the claimant is represented.  Brown v. Shalala, 44 F.3d 931, 934 (11th Cir. 1995) (citation omitted).  Additional evidence, however, is not necessary if the record contains sufficient evidence to make a decision.  Wilson v. Apfel, 179 F.3d 1276, 1278 (11th Cir. 1999).  Further, ". . . there must be a showing of prejudice before we will find that the claimant's right to due process has been violated to such a degree that the case must be remanded to the Secretary for further development of the record."  Brown v. Shalala, 44 F.3d at 935.  The court should be guided by "whether the record reveals evidentiary gaps which result in unfairness or 'clear prejudice.' "  *Id.*; Graham v. Apfel,129 F.3d at 1423.

Plaintiff has shown that this record contains evidentiary gaps resulting in unfairness and clear prejudice.  Plaintiff submitted to the Appeals Council additional opinions of Dr. Ortiz.

On March 27, 2008, Dr. Ortiz determined that Plaintiff could walk only 50 feet before having to stop due to severe back pain and muscular pain and could sit for no longer than one hour.  R. 547.  This finding, if given substantial weight by the ALJ as it normally should be, would mean that Plaintiff could not do even sedentary work.  The ALJ noted at the hearing that a finding of disabled would be directed if Plaintiff could sit only two hours a day.  R. 683.

On October 9, 2009, Dr. Ortiz stated his opinion that Plaintiff's condition met Listing 1.04.  R. 580.  This finding, if given substantial weight as it normally should be, would automatically result in a finding of disability.

A remand is needed so that the ALJ can fully discuss these opinions of Dr. Ortiz and give them substantial weight, unless the reasons for not doing so are supported by substantial evidence in the record.  Since Dr. Ortiz's most recent opinions have set forth specific work restrictions, there is less need now on remand to ask Dr. Ortiz to further elaborate, but the ALJ always has discretion to seek additional evidence.

### Dr. Faruqui

Dr. Faruqui examined Plaintiff on a consultative basis.  A consultative examination, that is, a one-time examination by a physician who is not a treating physician, need not be given deference by the Commissioner.  McSwain v. Bowen, 814 F.2d 617, 619 (11th Cir. 1987); Kirby v. Astrue, 500 F.3d 705, 709 (8th Cir. 2007) (a consulting physician's opinion "deserves no special weight").  The opinion of a

consultative physician, however, is still a medical opinion deserving of consideration along with all of the other evidence.  If the opinion of a consulting physician is consistent with other medical evidence, it is entitled to great weight.  Moncrief v. Astrue, 300 Fed.Appx. 879, 881 (11th Cir. Dec 1, 2008) (not selected for publication in the Federal Reporter, No. 08-12853) (citing  20 C.F.R. § 404.1527(f)(2)(i)).  To like effect is Giddings v. Astrue, 2009 WL 1813741 (2nd Cir. Jun 26, 2009) (not selected for publication in the Federal Reporter, No. 08-1108-CV):

> We recognize, of course, that Dr. Hargraves only examined Giddings once, and is not entitled to the deference of a treating physician.  *See Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) ("With respect to 'the nature and severity of [a claimant's] impairment(s),' 20 C.F.R. § 404.1527(d)(2), the SSA recognizes a 'treating physician' rule of deference to the views of the physician who has engaged in the primary treatment of the claimant." (internal quotation marks omitted)).  We also acknowledge that generally, "in evaluating a claimant's disability, a consulting physician's opinions or report should be given little weight." *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990).  At the same time, ALJ Zolezzi did not refer to any medical opinion that contradicted the medical opinion of Dr. Hargraves as to Giddings's ability to sit, stand, or walk during the work day.  *And we have indicated that, when a medical opinion stands uncontradicted, "[a] circumstantial critique by non-physicians, however thorough or responsible, must be overwhelmingly compelling in order to overcome" it.  Burgess*, 537 F.3d at 129 (internal quotation marks omitted); *see McBrayer v. Sec. of Health and Human Servs.*, 712 F.2d 795, 799 (2d Cir. 1983) (stating that "t*he ALJ cannot arbitrarily substitute his own judgment for competent medical opinion*" and that "[w]hile an administrative law judge is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who testified before him" (citation and internal quotation marks omitted)); *see also Robinson v. Barnhart*, 366 F.3d 1078, 1082 (10th Cir. 2004) (*per curiam*) ("Even if a treating physician's opinion is not entitled to controlling weight, [t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided" in the Commissioner's regulations.) (internal quotation marks omitted); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995) ("As is the case with the opinion of a treating physician, the Commissioner must provide '*clear and convincing' reasons* for rejecting the uncontradicted opinion of an examining physician.").

Giddings v. Astrue, 2009 WL 1813741, *2 (emphasis added).

The opinion of Dr. Faruqui, that he did not think that Plaintiff would be able to return to work, was not discussed at all by the Administrative Law Judge.  Dr. Faruqui's opinion was consistent with the opinion of Dr. Ortiz.

The ALJ not only failed to give reasons for not crediting the opinion of Dr. Faruqui, he also made findings relating to Dr. Faruqui's report that are not supported by substantial evidence in the record.  The most important concerns Plaintiff's knee impairments and need to walk with a cane.  The ALJ determined that "Dr. Faruqui noted that [Plaintiff] was able to walk without" her cane.  R. 21.  In the same paragraph, the ALJ noted that an examination at the Bond Clinic determined that she had no crepitus or swelling in her knees and had "good musculature in the legs."  Id.  Later, the ALJ determined that Plaintiff "apparently is able to walk without [a cane] as noted by Dr. Faruqui and the treating notes from the Bond Clinic which do not show the claimant consistently using a cane for ambulation."  Since the ALJ determined that Plaintiff can do work that requires that she walk up to 2 hours a day, and occasionally lift and carry up to 10 pounds, R. 19, it is plain that the ALJ determined that Plaintiff is capable of sustained walking and that her ability to carry is not impaired by a need to use a cane.

This finding is not supported by substantial evidence in the record.  Dr. Faruqui did not say that Plaintiff could walk up to two hours a day without a cane, or that she could occasionally carrying 10 pounds, and it was error to draw that conclusion from what Dr. Faruqui said and from other evidence in the record.  Dr. Faruqui first said that a cane had helped Plaintiff take pressure off [her left leg] and for balance, and she could not climb steps without the cane.  R. 423-424.  He said that her gait was antalgic, and

she put more pressure on her right leg, but could walk without her cane.  R. 426.  The degree of such walking was then substantially qualified.  Dr. Faruqui observed that Plaintiff walked with a cane, looked depressed, and looked "somewhat uncomfortable while walking and sitting", did not sit for long, and walked only a few steps around the room.  R. 424.  Dr. Faruqui also found that Plaintiff had some difficulty getting up and down from examination table or getting up from a chair, and while getting up from a chair, put pressure on the cane.  R. 526.  Plaintiff could not completely squat due to pain.  *Id.*  Finally, Dr. Faruqui wrote: "She is ambulatory but uses a cane for ambulation *and I think it is medically necessary due to potential fall and as it helps her release pressure [from affected] side resulting in pain control.*"  *Id.*  (Emphasis added).

Further, Dr. Faruqui found significant crepitus in Plaintiff's knees bilaterally.  R. 426.  While no crepitus in Plaintiff's knees was recorded in May, 2006, at the Bond Clinic, on July 7, 2006, she had crepitus in her joints, R. 528, and on August 14, 2006, Nurse Towler found "a great deal of crepitus in both knees with passive range of motion."  R. 526.  The records from the Bond Clinic (R. 521-532) did not consistently report whether Plaintiff was using a cane, but that lack of consistency in recording is not especially good evidence as to the consistency of Plaintiff's use of a cane.  Use of a cane was noted only on August 14, 2006, at the Bond Clinic, R. 526, but on September 12, 2006, Plaintiff's ability to walk was so impaired that she was thinking of getting a walker, R. 525, and on October 10, 2006, it was noted that Plaintiff had pain "with any weightbearing," R. 524, and yet Nurse Towler made no notation that she was then using a cane.  She undoubtedly was using a cane on all visits to the Bond Clinic, given these findings.

Finally, and of greatest importance, Dr. Ortiz repeatedly found that Plaintiff had severe pain in her right knee and needed to see an orthopedic surgeon but could not afford to do so.  On January 9, 2007, Dr. Ortiz said that Plaintiff's "biggest problem is she needs surgery on both knees and is unable to afford it.  She doesn't have insurance."  R. 551.

There is very little else in the ALJ's opinion to explain why he did not give appropriate weight to the opinion of Dr. Faruqui.  *See* R. 21.  Consequently, this case should be remanded with instructions to the Commissioner that the opinion of Dr. Faruqui be given appropriate weight or, if not, that the reasons for not doing so be fully articulated and supported by substantial evidence in the record.

### ARNP Towler

 On September 12, 2006, ARNP Towler said that she had written a letter in support of Plaintiff's application for disability benefits.  R. 525.  On remand, in fulfillment of the duty to develop a fair record, the ALJ must contact the Bond Clinic and try to obtain this letter.  Alternatively, this may not be needed if the ALJ determines that the opinions of Drs. Ortiz and Faruqui are to be given substantial weight.

### Fibromyalgia

On remand, the ALJ must also address Plaintiff's diagnosis of fibromyalgia.  A full consideration of fibromyalgia is an essential component of consideration of Dr. Ortiz's opinions.

Plaintiff's pain could be attributed to degenerative disc disease, more clearly shown by objective evidence in the last MRI, and to her knee impairments, continuous

need to use a cane, and need for orthopedic treatment for her knees.  But some

significant portion of Plaintiff's pain appears attributable to fibromyalgia.

"Fibromyalgia is a rheumatic disease and the relevant specialist is a

rheumatologist."  Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996).[21]

> The Ninth Circuit has described fibromyalgia as a "rheumatic disease that
> causes inflammation of the fibrous connective tissue components of
> muscles, tendons, ligaments, and other tissue.  Common symptoms . . .
> include chronic pain throughout the body, multiple tender points, fatigue,
> stiffness, and a pattern of sleep disturbance that can exacerbate the cycle
> of pain and fatigue associated with this disease."  *Benecke v. Barnhart*,
> 379 F.3d 587, 589-90 (9th Cir. 2004).

Davis v. Astrue, 287 Fed.Appx. 748, 762 (11th Cir. Jul 09, 2008) (not selected for

publication in the Federal Reporter, No. 07-11648).  The signs of fibromyalgia,

according to American College of Rheumatology guidelines, are primarily tender points

on the body.  Green-Younger v. Barnhart, 335 F.3d 99, 107 (2nd Cir. 2003).  The court

there said:  "Green-Younger exhibited the clinical signs and symptoms to support a

fibromyalgia diagnosis under the American College of Rheumatology (ACR) guidelines,

including primarily widespread pain in all four quadrants of the body and at least 11 of

the 18 specified tender points on the body."  *Id.*  A patient's subjective complaint "is an

essential diagnostic tool" for the treating physician.  *Id.*, *quoting* Flanery v. Chater, 112

F.3d 346, 350 (8th Cir. 1997).  It is relevant to the weight of a treating physician's

opinion that he or she have "personally monitored the effectiveness of various therapies

and found that they failed to provide any significant improvement . . . ."  *Id.  See* Cox v.

---

[21] The court there found that the administrative law judge had an "all pervasive
misunderstanding of the disease," finding inappropriate that the ALJ criticized the
claimant "for having consulted a rheumatologist rather than an orthopedist, neurologist,
or psychiatrist."  78 F.3d at 307.

Barnhart, 345 F.3d 606, 609 (8th Cir. 2003) (a fibromyalgia case, finding a treating

physician's opinion not conclusory when it was the "culmination of numerous visits

[plaintiff] had with her past doctors, and his experience with treating her chronic pain.").

It is a misunderstanding of the nature of fibromyalgia to require " 'objective'

evidence for a disease that eludes such measurement."  Green-Younger, 335 F.3d at

108; Lee v. BellSouth Telecommunications, Inc., 2009 WL 596006, *8 (11th Cir. Mar 10,

2009) (not selected for publication in the Federal Reporter, No. 07-14901).  "Moreover,

a growing number of courts, including our own . . . have recognized that fibromyalgia is

a disabling impairment and that 'there are no objective tests which can conclusively

confirm the disease.' "Green-Younger, 335 F.3d at 108 (citations to cases from the 6th,

8th, and 9th Circuits omitted).  "[P]hysical examinations will usually yield normal results

– a full range of motion, no joint swelling, as well as normal muscle strength and

neurological reactions."  Id., at 108-109.  "[S]welling of the joints is not a symptom of

fibromyalgia  . . . ."  Sarchet, 78 F.3d at 307.   See also Brown v. Barnhart, No. 05-5143,

2006 WL 1431446, *2 and n. 1 (10th Cir. 2006) (unpublished).

The diagnosis of fibromyalgia in this case was supported by a finding of 18 of the

18 fibromyalgia trigger points.  On remand, the ALJ must determine whether to give

substantial weight to the opinions of Dr. Ortiz.  If the records from Plaintiff's treating

rheumatologist cannot be found,[22] then Dr. Ortiz is the expert for treatment of all of

Plaintiff's maladies, including fibromyalgia.  Some of the medications prescribed by Dr.

Ortiz seems to have been aimed at treating pain from fibromyalgia rather than just from

---

[22] Apparently Dr. Zeb provided some treatment, but the ALJ did not acquire those
treatment records.

degenerative disc disease.  See the medications described in footnotes 2, 14, and 20, *supra*.  It would be error to discount Dr. Ortiz's opinion in reliance upon a lack of objective medical evidence to support Plaintiff's description of the degree of pain that she experiences from fibromyalgia.

### Whether the ALJ erred in finding at step 2 that Plaintiff's depression was not severe and in failing to account for mental limitations when he determined Plaintiff's residual functional capacity at step 4

At step 2, the issue is whether Plaintiff has shown that he or she has a condition which has more than "a minimal effect on her ability to:  walk, stand, sit, lift, push, pull, reach, carry, or handle, etc."  Flynn v. Heckler, 768 F.2d 1273, 1275 (11th Cir. 1985) (relying on 20 C.F.R. § 404.1521).  "In other words, the 'severity' of a medically ascertained disability must be measured in terms of its effect upon ability to work, and not simply in terms of deviation from purely medical standards of bodily perfection or normality."  McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986).

"[I]n order for an impairment to be non-severe, 'it [must be] a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.' "  Parker v. Bowen, 793 F.2d 1177, 1181 (11th Cir. 1986), *citing* Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984), Edwards v. Heckler, 736 F.2d 625, 630 (11th Cir. 1984), and Flynn, 768 F.2d at 1274.  "Step two is a threshold inquiry.  It allows only claims based on the most trivial impairments to be rejected.  The claimant's burden at step two is mild."  McDaniel v. Bowen, 800 F.2d 1026, 1031 (11th Cir. 1986) (clarifying Brady).  A "severe impairment" is a "de minimis requirement which only screens out those applicants whose medical problems could 'not possibly' prevent them

from working." Stratton v. Bowen, 827 F.2d 1447, 1452 n. 9 (11th Cir. 1987), *quoting*

Baeder v. Heckler, 768 F.2d 547, 551 (3d Cir. 1985). It also has been characterized by

the Supreme Court as a criterion which identifies "at an early stage those claimants

whose medical impairments are so *slight* that it is unlikely they would be found to be

disabled even if their age, education and experience were taken into consideration."

Stratton, 827 F.2d at 1452 n. 9 (emphasis by the court), *quoting* Bowen v. Yuckert, 482

U.S. 137, 153, 107 S.Ct. 2287, 2297, 96 L.Ed.2d 119 (1987).

An erroneous finding as to "severe" impairments at step 2 may improperly

foreclose a claimant's "ability to demonstrate the merits of her claim for disability with

respect to her former work activities." Flynn, 768 F.2d at 1275. Impairments must be

evaluated in combination at all stages of the analysis. 20 C.F.R. §§ 404.1523 and

416.923; Lucas v. Sullivan, 918 F.2d 1567, 1574 (11th Cir. 1990); Swindle v. Sullivan,

914 F.2d 222, 226 (11th Cir. 1990); Davis v. Shalala, 985 F.2d 528, 534 (11th Cir.

1993).

Moreover, impairments must be evaluated in combination even though some

impairments are not severe. Hudson v. Heckler, 755 F.2d 781, 785 and n. 2 (11th Cir.

1985). The Eleventh Circuit has "repeatedly held that an ALJ must make specific and

well-articulated findings as to the effect of the combination of impairments when

determining whether an individual is disabled." Davis v. Shalala, 985 F.2d at 534.

The ALJ found that Plaintiff's mental impairments, major depressive disorder and

pain disorder, either singly or in combination, do not cause more than minimal limitation

of Plaintiff's ability to perform basic mental work activities and, therefore, are non-

severe. R. 19. He based this conclusion upon Dr. Annis's opinion, which he found to

be credible, and Plaintiff's "reported activities of daily living." *Id*. He also said that Plaintiff had not required "ongoing mental health treatment" or hospitalization. R. 22. He noted that Dr. Annis found that she had major depressive disorder and pain disorder associated with a general medical condition, and unspecified below average intelligence, suspected but not tested, but also noted that Plaintiff had no decline of attention, was well oriented, and was able to recall 2 out of 3 items after 30 minutes. *Id*. The ALJ noted that the second consultative examination by Dr. Annis produced the same results. *Id*. He also noted that the evidence did not show complaints of depression until Plaintiff was treated at the Bond Clinic in March, 2006, and even then, the diagnosis was only minimal to mild situational depression. *Id*. He said in early July, 2006, Nurse Towler prescribed an antidepressant and Plaintiff reported that she was feeling better, suggesting that medication effectively controlled her depression. *Id*.

These findings are not supported by substantial evidence in the record.  To begin with, the note concerning depression at the Bond Clinic in March, 2006, is not the first evidence of treatment for depression.  On October 17, 2002, Dr. Zeb noted that Plaintiff was taking a medication for depression, Wellbutrin, and seeing Dr. Thai, her psychiatrist.  R. 263.  On December 15, 2003, Dr. Ortiz said that Plaintiff was taking Trazodone, an anti-depressant.  R. 209.  On February 11, 2004, PA Beverly Walker, who worked for Dr. Ortiz, again noted that Plaintiff was taking Trazodone, had taken Wellbutrin without much success, and had a history of depression.  R. 203.  On April 7, 2004, Plaintiff told PA Walker that she felt less depressed since starting to use Effexor, another anti-depressant.  R. 200.  On June 29, 2004, Dr. Ortiz switched Plaintiff from Effexor to Lexapro, another anti-depressant.  R. 199.  On November 1, 2004, Dr.

Faruqui said that while Plaintiff had been diagnosed with depression and had been treated by a psychiatrist in the prior five years, she relied upon her primary physician for medication for depression.  R. 424.  *Id.*  Dr. Faruqui noted that Plaintiff looked depressed.  *Id.*  He concluded that Plaintiff's depression needed to be evaluated, and he doubted very much whether she could return to work due to her depression and pain.  R. 426.

On November 4, 2004, Plaintiff had a mental status consultative evaluation by Dr. Annis.  R. 427-428.  By this time, the medical record plainly showed a history of depression and a long period of treatment with anti-depressant medications.  Dr. Annis found that Plaintiff's mood during the interview was depressed and moderately anxious.  R. 428.  Plaintiff told Dr. Annis that she was sad and depressed, feeling like no one cared, and in "so much pain."  *Id.*  She said she cried every day and sometimes does not know why.  *Id.*  Dr. Annis's diagnosis was major depressive disorder, recurrent, chronic pain disorder associated with a general medical condition, and "unspecific below average intelligence (suspected but not tested)."  R. 429.  Dr. Annis thought that at least some degree of depression was likely to continue for the foreseeable future, though treatment might help.  *Id.*  Dr. Annis said that in her activities of daily living, Plaintiff sought "assistance meeting demands that require physical agility, strength and stamina."[23]  *Id.*  He thought that Plaintiff was "socially handicapped by depression and

---

[23] This finding alone is directly contrary to the ALJ's reasoning that the evidence of Plaintiff's "activities of daily living" compel a finding that her depression was not a severe impairment.  But, as will be discussed ahead, Plaintiff's own description of her activities of daily living at the second administrative hearing show a marked impairment of those activities.

anxiety." *Id.* He said that her "*current mental condition would be expected to reduce her ability to participate in social interactions requiring patience in difficult situations, careful attention, or protracted concentration.*" *Id.* (emphasis added). Dr. Annis concluded:

> *Evidence was found of depression and anxiety to the degree that occupational achievement is impeded.* If Ms. Smith's physical condition permits work, s*he would require more encouragement than do most people when encountering work difficulties or social challenges.* She *would probably not do well in occupations requiring frequent, protracted or demanding social interaction, such as receptionist, restaurant server, cashier, or sales clerk.* Due to her distraction to physical and emotional factors, she should presently *avoid employment at occupations requiring technical precision. If she is physically able,* she is likely to do better in vocations that deal mostly with things, such as dishwasher, data entry operator, agricultural laborer, or cleaner.

R. 429-430 (emphasis added). Dr. Annis also said that given her "history and interview presentation, your office may wish to consider evaluating intellectual functioning." R. 430.

On May 23, 2005, Dr. Annis re-examined Plaintiff. R. 491-494. Dr. Annis again found that Plaintiff's mood was depressed and anxious. R. 493. She again said that she cries daily. *Id.* Dr. Annis's diagnosis again was recurrent major depressive disorder, chronic pain disorder associated with a general medical condition, and unspecified below average intelligence (suspected but not tested). *Id.* He thought that her depression and anxiety were "directly caused by physical limitations and physical pain, and by dependence on others to do things for her, reduced her [sic] ability to do things with family, financial concerns, diminished social opportunities, missing relationships and self-esteem associated with employment, and concern about her relationship with her husband." R. 493-494. Dr. Annis thought that her depression and

anxiety would continue so long as she experienced major physical problems.  R. 494.

He thought that her activities of daily living were limited by her need for assistance from

others.  *Id.*  He thought that depression limited her ability to interact with people she

does not know.  *Id.*  He concluded that her depression and anxiety would impede her

occupational achievement, and she would need more encouragement than others, even

if physically able to work.  *Id.*  He said she would not do well in work requiring frequent

social interaction, and should also avoid work requiring technical precision, driving,

operating machinery, or contact with dangerous substances.  *Id.*  He again suggested

that Plaintiff's intellectual functioning be tested.  *Id.*

Plaintiff's treatment for depression continued after she was evaluated by Dr.

Annis.  On April 2, 2007, Dr. Ortiz said that Plaintiff suffered from severe back pain,

fibromyalgia, obesity, and depression.  R. 548.  On December 1, 2008, Dr. Ortiz gave

Plaintiff a prescription for Cymbalta, an anti-depressant.  R. 558.

In summary, having found Dr. Annis to have been credible, the ALJ's finding that

Plaintiff's depression was not "severe" at step 2 is not supported by substantial

evidence in the record.  There is a long history of treatment of depression both before

and after that opinion, and Dr. Annis said that Plaintiff's depression and anxiety were

sufficiently severe that her occupational achievement would be impeded.  Specifically,

he said she would probably not do well in work requiring social interaction.  That means

she could not do her past relevant work, which required constant telephone contact with

the public.

The step 2 error did not self-correct at step 4, as the ALJ failed to add any

impairment for depression and anxiety in his residual functional capacity determination.

R. 19.  He said she had no limitations from her emotional problems.  *Id.*  The vocational

expert said that the clerical jobs he identified (which the ALJ determined that Plaintiff

could do within her residual functional capacity) required "communication skills . . .

dealing with the public and also dealing with other agencies."  R. 676.  Since he found

Dr. Annis to be credible, the ALJ should have included in his residual functional capacity

determination a finding that Plaintiff would require more encouragement than most

people do when encountering work difficulties or social challenges, and that she was

limited in her ability to have frequent, protracted, or demanding social interaction, or in

her ability to do work requiring technical precision.  A remand is needed to add that to

the hypothetical to be put to the vocational expert.

### Whether the ALJ erred in his evaluation of the credibility of Plaintiff

"If the ALJ discredits subjective testimony, he must articulate explicit and

adequate reasons for doing so."  Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir.

2002).  The reasons articulated by the ALJ for disregarding the claimant's subjective

testimony must be based upon substantial evidence.  Jones v. Department of Health

and Human Services, 941 F.2d 1529, 1532 (11th Cir. 1991).   "Failure to articulate the

reasons for discrediting subjective testimony requires, as a matter of law, that the

testimony be accepted as true."  Wilson v. Barnhart, 284 F.3d at 1225.

The ALJ discounted Plaintiff's testimony as to the pain she experiences in part

because he found that "no treating physician has imposed significant restrictions."  R.

22.  That finding is not supported by substantial evidence for the reasons discussed

above.  Dr. Ortiz's opinion that Plaintiff is totally disabled, that is, completely unable to

do any sort of work, is an opinion of a treating physician imposing very significant restrictions.

The ALJ also discounted Plaintiff's testimony because he found that she can walk without a cane.  R. 22.  That finding is not supported by substantial evidence for the reasons set forth above.  It is a particularly inappropriate reason for not believing Plaintiff, given the fact that Dr. Ortiz said that Plaintiff needed knee surgery for significant knee pain and Plaintiff was unable to afford such medical treatment.

The ALJ discredited Plaintiff by the finding that she had "admitted to a fairly active lifestyle, including attending to her personal needs, driving, attending church services, occasional shopping for groceries, reading, and doing puzzles."  R. 23. Plaintiff did not "admit" to a fairly active lifestyle.  Plaintiff testified that she can sit for a couple of hours before having to move, but could stand for only 5 to 10 minutes.  R. 655.  She said that she not get up until 10 or 11 a.m.  R. 662.  She said that she is able to fix cereal for breakfast, but her husband does the cooking and she seldom cooked. R. 662, 668.  She said that she could not do the laundry, vacuuming, sweeping, mopping, bed making, sewing, card playing, or gardening, and only sometimes could sit and do the dishes.  R. 658-659.  She sometimes watched television, but did not use the computer in her home.  *Id.*  She attended church once a week but did not drive to the hearing.  R. 659.  She said she rested in bed in the mid-afternoon and stayed in bed until 7 or 8 p.m.  R. 662-663.  She spends 4 to 6 hours daily lying down.  R. 664. Sometimes she walks out onto her porch.  *Id.*  Plaintiff said that she was depressed "a lot."  R. 665.  She was depressed "most of all the time."  R. 666.  She said: "I cry, what I'm doing now."  *Id.*  She said that the medication she takes for depression does not

help.  R. 667.  She said that her depression "affects me as being whole, I can't do the

things that I want to do."  *Id.*  Moreover, even if Plaintiff had described more extensive

activities of daily living, that would do little to discredit her testimony.[24]

    The ALJ discounted Plaintiff's testimony as to the debilitating effect of her

depression.  R. 22-23.  He said that Plaintiff "has had no ongoing treatment for mental

health issues apart from some medication she received from the nurse practitioner at

the Bond Clinic."  *Id.*  This basis for rejecting Plaintiff's testimony as to the severity of

her depression is not supported by substantial evidence in the record for the reasons

discussed above.

    Since the reasons given by the Administrative Law Judge to disbelieve Plaintiff's

testimony as to the degree of pain and depression she experiences are not supported

by substantial evidence in the record, this court now must find that that testimony is

true.  The case should be remanded for further evaluation with the instruction that the

---

    [24] Ross v. Apfel, 218 F.3d 844, 849 (8th Cir. 2000) ("The ability to perform sporadic
light activities does not mean that the claimant is able to perform full time competitive
work."); Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995) (the court must consider
the entire record when determining whether the evidence of a claimant's daily activities
is substantial evidence for the conclusion that she retains the residual functional
capacity to work); Lewis v. Callahan, 125 F.3d 1436, 1441 (11th Cir. 1997) ("Nor do we
believe that participation in everyday activities of short duration, such as housework or
fishing, disqualifies a claimant from disability or is inconsistent with the limitations
recommended by Lewis's treating physicians."); Parker v. Bowen, 793 F.2d 1177, 1180
(11th Cir. 1986) (when considering daily activities, the entire record must be considered,
including the claimant's testimony that she had to lie down after two hours of such
work); Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995) (a conclusory citation to a
claimant's "daily activities" as a basis for failing to believe her testimony as to pain was
insufficient where there was a medical condition that reasonably could have given rise
to the pain described, and, although she testified that she cooked and shopped for
herself, she had trouble putting on her clothing).

ALJ consider as true and established Plaintiff's testimony as to the severity of her pain and depression.

**Conclusion**

Considering the record as a whole, the findings of the Administrative Law Judge were not based upon substantial evidence in the record and did not correctly follow the law. The decision of the Commissioner to deny Plaintiff's application for benefits should be reversed and remanded to correct the errors and findings described above in this report and recommendation.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **REVERSED** and **REMANDED** and the Commissioner be **ORDERED** (1) to fully discuss all of the opinions of Dr. Ortiz and give them substantial weight, or to clearly articulate the reasons for not doing so, supported by substantial evidence in the record; (2) to fully discuss the opinion of Dr. Faruqui and give it appropriate weight, or to clearly articulate the reasons for not doing so, supported by substantial evidence in the record; (3) to contact the Bond Clinic and obtain or account for the letter written by ARNP Towler, unless it is not needed because the ALJ determines that the opinions of Drs. Ortiz and Faruqui are to be given substantial weight; (4) to correctly consider the effect of fibromyalgia upon Plaintiff's experience of pain, in accordance with the caselaw set forth in this report and recommendation; (5) to include in the residual functional capacity determination a finding that (a) Plaintiff would require more encouragement than most people do when encountering work difficulties or social challenges, (b) is limited in her ability to have frequent, protracted, or demanding social interaction, and (c) is limited in her ability to

do work requiring technical precision; and (6) to find that Plaintiff's testimony at the administrative hearing as to the severity of her pain and depression is true and now established.

 **IN CHAMBERS** at Tallahassee, Florida, on September 16, 2011.


     s/ William C. Sherrill, Jr.
     **WILLIAM C. SHERRILL, JR.**
     **UNITED STATES MAGISTRATE JUDGE**



### NOTICE TO THE PARTIES

 **A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**